UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAMES F. WRIGHTEN ) | |
| ) | C.A. NO. |
| ) | 3:07-CV-00257 (JBA) |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| NEW LONDON POLICE DEPARTMENT ) | March 13, 2009 |
| ) | |
| Defendant. ) | |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION IN LIMINE REGARDING EVIDENCE OF HATE CRIME
DIRECTED AGAINST PLAINTIFF'S FAMILY IN 1957**

The Defendant, the New London Police Department, offers this memorandum of law in support of its motion *in limine* to exclude testimony, evidence and/or argument that refers, reflects or relates to an incident in North Carolina involving the Plaintiff's family that occurred in 1957.

**I.    BACKGROUND**

According to the Plaintiff's undated "Substitute Amend[ed] Complaint" (the "Amended Complaint"), this action arises from an investigatory stop that occurred on January 28, 2007 at the corner of Ocean Avenue and Bank Street in New London. Read in its most favorable light, the Amended Complaint attempts to assert a cause of action for an unidentified "civil rights violation" sounding under 42 U.S.C. § 1983, the Fourth

and Fourteenth Amendments of the United States Constitution, and Article I, Sections 7 and 9 of the Connecticut Constitution.

The Plaintiff alleges that on the evening of January 28, 2007, he was parked in front of a grocery store at the corner of Ocean Avenue and Bank Street when he observed a "black or Hispanic male coming across . . . the street toward's Sam's." Complaint at paras. 9-10. The Plaintiff observed police vehicles responding to the scene and thought "Something hot must be going on". Id. at para. 12. Several police vehicles entered the parking lot and one officer instructed the Plaintiff to "stay put." Id. at 13. The officer proceeded to check Plaintiff's driver's license. Id. at para. 14-15. The officer informed Plaintiff that he was not accusing Plaintiff of any wrongdoing. Id. at paras. 17, 43, 46, 52.

After checking his license, the officer permitted Plaintiff to resume his travel. Plaintiff claims that there was no probable cause for the stop and "surmise[s] that these actions were taken because of my race." He presumes that the stop was motivated by racial animus and the belief that Plaintiff "was there to buy drugs." Id. at paras. 30, 40, 44. Further, Plaintiff alleges that "presumptions were ultimately made about my race, gender and my person generally." Id. at para. 40.

The Plaintiff gave sworn deposition testimony in this action on November 30, 2007. Plaintiff testified during the deposition that he was parked in the parking lot and there were no other pedestrians in the area at the time of the incident. See Exhibit A, excerpts from the deposition of James Wrighten, p. 51. After parking his vehicle and standing for

"about four minutes", Plaintiff saw a police cruiser pass behind his car. Id. at p. 52. At approximately the same time, Plaintiff observed "a man walking into the parking lot" from the right, from Spring Street. Id.  The man, a "young black or Hispanic man", was walking in the middle of the parking lot. Id. at 53.  The man then turned around and Plaintiff observed "blue lights going up Spring Street" after the man. Id. at 54.  The man was between 20 and 30 feet from Plaintiff's vehicle when he turned around and fled the parking lot. Id. at p. 58.

The police detained the Plaintiff for approximately seven minutes. Id. at p. 65. During this time, the Plaintiff was not asked to get out of his vehicle. Id.  The Plaintiff resides near the incident parking lot and has observed illegal activity in the parking lot on many previous and subsequent occasions. Id. at pp. 69-70.

Also during his deposition, the Plaintiff testified that in 1957, his family was the victim of a "cross burning" incident. Apparently, the burning cross was placed in front of his family's home in Charleston, South Carolina. Id. at pp. 36-39. The Plaintiff never learned what individual or group committed the crime. Id. He believes the crime was reported to law enforcement and investigated; however, no arrests were ever made. The Plaintiff testified that the detectives who interviewed his family "were just as white, I believe, as the person who put the cross in front of the house. It's like calling -- it's like calling the fox to protect the hen house." Id. at p. 38. The Plaintiff testified the incident

"bothered" him, but that he did not receive any treatment or counseling following the incident. Id. at p. 39.

## II. LAW AND ARGUMENT

### A. The Evidence Should be Excluded Because is Not Relevant and Probative Under F.R.E. §§ 401 or 402.

"As a general matter, all relevant evidence is admissible under the Federal Rules of Evidence unless specifically excluded." United States v. Perez, 387 F.3d 201, 209 (2d Cir.2004) (citing F.R.E. §402). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." F.R.E. §401. This standard should be interpreted liberally. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 587, 113 S.Ct. 2786 (1993) ("Rule[ ] [401's] basic standard of relevance thus is a liberal one."). District courts, however, have broad discretion to assess whether evidence is truly relevant. Perez, 387 F.3d at 209. A district court's relevancy determination will not be overturned unless it is arbitrary or irrational. Id. ("District courts have broad discretion to assess the relevancy of evidence and we will not overturn that determination unless it is arbitrary or irrational.").

The core issue in this case is whether the Defendant established and maintained a policy, custom or practice, as required by Monell v. Dept. of Soc. Svcs. Of City of New York, 436 U.S. 658, 98 S.Ct. 2018 (1978) and its progeny, that caused a deprivation of

4

the Plaintiff's Fourth Amendment rights, as applied to the States under the Fourteenth Amendment. The events and circumstances of January 28, 2007 are the only relevant events in this case. What occurred in another state, *nearly fifty years before the incident*, and involving unknown perpetrators, cannot possibly be probative of any fact of consequence in this case. At his deposition, the Plaintiff was unable to articulate how the two events were in any way related, other than both were "sneaky" and "bothered" him. Such broad statements are clearly insufficient to make any logical connection between the events. The cross burning event -- while truly tragic -- has absolutely no probative value and has nothing to do with the issues in this case.

      **B.**      **The Evidence, if Admitted, Would Be Grossly Prejudicial to the Defendant.**

In addition, pursuant to F.R.E. §403, relevant evidence may be excluded where its probative value is substantially outweighed by the danger of "unfair prejudice, confusion of the issues, or misleading the jury . . . ." Each of these grounds provides an additional, independent basis on which to exclude the evidence of the 1957 cross burning. Such prejudice "may be created by the tendency of the evidence to prove some adverse fact not properly in issue *or unfairly to excite emotions against the defendant*." (emphasis added) United States v. Quattrone, 441 F.3d 153, 186 (2d Cir.2006) (quoting United States v. Figueroa, 618 F.2d 934, 943 (2d Cir.1980)). To justify excluding evidence under the Rule, "the prejudice must be unfair in the sense that it could unduly inflame the

passion of the jury, confuse the issues before the jury, or inappropriately lead the jury to convict on the basis of conduct not at issue in the trial." Id. A limiting instruction could not possibly quell the emotion such an event might provoke in the jurors. This is especially true in this case, where the Plaintiff is unable to describe any connection between that remote event from his past and the officers' conduct on the night of January 28, 2007. Accordingly, such incendiary evidence must be excluded under F.R.E. §403.

### III. CONCLUSION

For all the foregoing reasons, the Defendant, the New London Police Department, moves *in limine* for an order excluding testimony, evidence and/or argument that refers, reflects or relates to the cross burning incident that occurred in Charleston, South Carolina in 1957.

Respectfully submitted,

THE DEFENDANT,
CITY OF NEW LONDON


By:_____
    Thomas J. Londregan, Esq.
    Brian K. Estep, Esq.
    Fed. Bar No. CT-07986
    Patrick J. Day, Esq.
    Fed. Bar No. CT-21858
    Conway & Londregan, P.C.
    38 Huntington St., P.O. Box 1351
    New London, CT  06320-1351
    Ph. 860-447-3171
    Fax 860-444-6103

## **CERTIFICATION**

      I hereby certify that a copy of the foregoing was mailed, postage prepaid to all counsel and *pro se* parties of record this 13th day of March, 2009 as follows:

Donald L. Williams, Esq.
Williams Law Office
255 Rte. 12, #23
Groton, CT  06340

                                                        _____
                                                        Patrick J. Day

F:\Files\CITY\24000 Police\24100's\24166 Wrighten\Trial\Memo of Law Motion in Limine.doc

1

```
                    UNITED STATES DISTRICT COURT

                       DISTRICT OF CONNECTICUT


JAMES F. WRIGHTEN              : CIVIL ACTION NO.
                               : 3:07-CV-00257 (JBA)
vs.                            :
                               :   COPY
CAPTAIN KENNETH EDWARDS        :
NEW LONDON POLICE DEPARTMENT   : NOVEMBER 30, 2007
```

         Deposition of JAMES F. WRIGHTEN, taken

pursuant to Rule 30 of the Federal Rules of Civil

Procedure, at the offices of Conway & Londregan, P.C.,

38 Huntington Street, New London, Connecticut, before

Kathryn Orofino Little, a Notary Public in and for the

State of Connecticut, on November 30, 2007, at

10:05 a.m.




                      Kathryn Orofino Little
                       Shea & Driscoll, LLC
                     Court Reporting Associates
                         16 Seabreeze Drive
                   Waterford, Connecticut  06385



                         **EXHIBIT** A

                 SHEA & DRISCOLL (860) 443-3592

1    A    Uh-huh.

2    Q    What about psychological trauma in your past; have you had any psychological or psychiatric trauma in your past?  Any event?

5    A    You know, I had -- at 15 years old I had -- my daddy was -- my dad was a lawyer and my dad was running for State House Representative in South Carolina when I was 15.  And he -- on the morning after Thanksgiving, it had to have been the morning after Thanksgiving, we woke up and there's this huge cross in the front of the house burning like hell.

Some person on the phone called back and said, "We're going to come back to kill you niggers." And it left an imprint on my mind.  It caused -- it caused a lot of cynicism.  It caused a lot of mistrust and --

17    Q    Let me back up and just take you through this a little more slowly, the event you're describing. Okay?

20    A    Uh-huh.

21    Q    Approximately what year did this occur?

22    A    1957.

23    Q    And where did this happen?

24    A    In Charleston.

25    Q    Your family was living in Charleston, South

1  Carolina?
2      A   Uh-huh.
3      Q   And did you answer the phone?
4      A   I did. My older brother and myself, we
5  ran -- you know, we were a little bit macho, so we ran
6  to the front to see what's going on. Like I said, you
7  know, big, big fire in front of the door. And it
8  did -- it did bother me.
9      Q   Let me just direct you to Defendant's Exhibit
10 A, which I believe is your responses to our
11 interrogatory questions. Do you recall giving those
12 answers and serving them on this office?
13     A   Yes.
14     Q   Take a minute to look through it.
15     A   I did say that, uh-huh.
16     Q   Are you describing the event that's
17 identified in response to Interrogatory 2?
18     A   What's the question of Interrogatory 2?
19     Q   Looks like it's on the bottom of the first
20 page, you will see a "2" in parentheses.
21     A   Yes. Yes, uh-huh.
22     Q   Did you report that incident to the
23 authorities?
24     A   I'm sure we did.
25     Q   Okay. And what action was taken as a

1  result?

2  A  They came, but they were -- I don't want to
3  sound rude or disrespectful, but they were just as
4  white, I believe, as the person who put the cross in
5  front of the house.  So there was a whole lot of
6  suspicion about who's coming.  It's like calling --
7  it's like calling the fox to protect the hen house.

8  Q  Well, let me ask you this:  You recall police
9  officers actually responding to your house?

10 A  They did.  They did, yeah.

11 Q  That night?

12 A  That night, oh, yeah, they were there.

13 Q  Did they take statements?

14 A  I believe they did.

15 Q  And to your knowledge, did they investigate
16 that crime?

17 A  I believe they did.

18 Q  And do you know whether anyone was ever
19 arrested or prosecuted as a result of that crime?

20 A  Let's be for real.  We're talking about
21 something that happened in 1957.

22 Q  I'm just asking if you recall.

23 A  Yeah.  After, yeah.  There were nobody
24 arrested.

25 Q  Do you know that for a fact, or do you just

1  believe that?

2      A    No, I know that for a fact.  There was nobody
3  arrested.

4      Q    Did you actually see anyone place the cross
5  on your lawn?

6      A    No.  We had just gotten home from -- my
7  brother was 17, I was 15 at the time, we had just
8  gotten home from a teenage dance, and we had just
9  gotten in the house.  We had been in the house maybe
10  10 -- 10 minutes before the cross was put, so I mean,
11  somebody probably saw us when we were going into the
12  house.

13     Q    But you didn't see those people?
14     A    No.
15     Q    And you never discovered who actually placed
16  that cross on your property?
17     A    No.  No.
18     Q    What kind of treatment or counseling, if any,
19  did you undertake as a result of that incident?
20     A    None.
21     Q    And bringing us forward to the date of the
22  event that you claim in this lawsuit, January 28,
23  2007, did you undergo any treatment or counseling in
24  connection with that previous incident?
25     A    I went to see, I believe we spoke about it,

```
 1  or two away?
 2      A    Probably a space or two.  I'm not sure.
 3      Q    Were there any occupants in that vehicle?
 4      A    I don't recall.
 5      Q    What about pedestrians in the parking lot;
 6  did you see anybody in the parking lot?
 7      A    Not when I came in.
 8      Q    What about in front of the store; anybody
 9  milling on the sidewalk?
10      A    Not when I came in.
11      Q    All right.  So you don't recall seeing
12  anybody in the parking lot?
13      A    No.
14      Q    At all?
15      A    No.
16      Q    Okay.  You park your vehicle?
17      A    Uh-huh.
18      Q    Did you shut the ignition off?
19      A    Yes.
20      Q    Okay.  And your wife --
21      A    Goes into the store.
22      Q    -- exits the vehicle and goes into the
23  store?
24      A    Right.
25      Q    And what happens after that?
```

1  A    About four minutes after my being parked
2  there, I saw a police cruiser pass behind my car.  And
3  what brought my attention to him was that white panel
4  light that he has in his cruiser.  So I looked at him
5  as he passed behind my car.
6       I'm seeing someone to the right coming
7  into the parking lot.  I observed a man walking into
8  the parking lot.  And while I'm giving you this, allow
9  me to give you this.  That in reading -- in reading
10 the reports that was sent to me under discovery, the
11 first report deals with the man walking in the street,
12 the first one I got.  And up at the top of the page it
13 has --
14 Q    Well --
15 A    That one (indicating).  That one
16 (indicating).
17 Q    Okay.  But what I'm asking you is what you
18 recall.
19 A    I'm telling you what I recall.
20 Q    Okay.
21 A    I recall seeing a man coming into the parking
22 lot.
23 Q    He's on your right?
24 A    On the right side, coming from Spring
25 Street.

1    Q    Is he in the parking lot?

2    A    He might be just be getting into the parking
3  lot from Spring Street.

4    Q    Okay. And where is he along the perimeter of
5  the property; is he toward the store front or toward
6  Ocean Ave.

7    A    Walking in the middle of the parking lot, I
8  believe.

9    Q    Okay. So is he coming in the same entrance
10 that you used with the vehicle?

11   A    Yeah.

12   Q    All right. And when you see the police
13 cruiser -- withdrawn.

14        How did you notice the police cruiser
15 behind you; were you looking in your rear-view or
16 side-view?

17   A    My side-view. And the lights -- the lights
18 to his panel, he has some kind of contraption up in
19 the middle of his dash. It was dark. That light
20 caught my attention.

21   Q    Are these flashing lights?

22   A    It wasn't a blue flashing light. The
23 computer station up near his dash caught my attention,
24 caught my eyes, because it came behind me.

25   Q    And that's when you observed --

1       A       The officer.

2       Q       -- the man -- you observed the officer and
3  the cruiser?

4       A       And the man.  And the man.

5       Q       Who is just entering the parking lot from --

6       A       Uh-huh.

7       Q       -- excuse me, from Spring Street?

8       A       Spring Street.

9       Q       And what happened next?

10      A       I believe I saw the man turn around and I see
11 blue lights going up Spring Street, so I said to
12 myself, "Man, something" -- "something really hot is
13 going on now."  And I didn't think anything of it,
14 because I'm parked in my car and I had nothing to do
15 with the man coming into the -- come into the --

16      Q       I understand that's your testimony.

17      A       Uh-huh.

18      Q       But in your complaint you allege a young
19 Black or Hispanic male was the person entering the
20 parking lot.

21      A       That's what he was.

22      Q       And why did you say something hot must be
23 going on?

24      A       Because the blue lights are flashing like
25 hell.  The police aren't going to have the lights

58

1  Sam's.
2    Q    15 feet, 20 feet?
3    A    He's coming past Sam's.
4    Q    But you can't tell me how close he was to the
5  front door?
6    A    No.  He's coming past Sam's.  He's in the
7  parking lot --
8    Q    Right.
9    A    -- coming past Sam's.
10    Q    Okay.
11    A    Uh-huh.
12    Q    How far is he from your vehicle?
13    A    20 feet, 30 feet away.
14    Q    And is that when you see him turn and
15  leave?
16    A    Uh-huh.
17    Q    Okay.  Does he run out of the parking lot?
18    A    He -- he has to walk real fast.
19    Q    Is he carrying anything?
20    A    Himself.
21    Q    No, I mean, in his hands; did you see
22  anything in his hands?
23    A    Himself.  He's carrying himself out of the
24  parking lot.
25    Q    Anything on his back, a backpack or other

1   A    Parked.

2   Q    So he comes back and he tells you he's not
3   accusing you of any wrongdoing?

4   A    Right.

5   Q    What happens then?

6   A    And he said I can -- I can leave.

7   Q    All right.  So the whole thing took seven
8   minutes?

9   A    Seven minutes.

10  Q    And he told you you were free to leave?

11  A    Uh-huh.  But again, that's after the stop was
12  made.  That's after he violated my rights.

13  Q    Did he ask you to get out of the vehicle?

14  A    No.

15  Q    Did he search the vehicle?

16  A    No.

17  Q    At any point did he draw his weapon or make a
18  show of force?

19  A    Listen, let's not play with words.  When he
20  pulled his car behind my car, don't you think that was
21  a show of force?

22  Q    You said you felt threatened and intimidated.

23  A    I did feel threatened and intimidated by all
24  those officers being there.

25  Q    Okay.  That's all I'm trying to get at.

1  than that.

2       Q    But he never said --

3       A    He said to me as he's leaving my car, "I

4  thought I knew you better than that."

5            Thought you knew me better than what?

6       Q    You made the conclusion that he was implying

7  you were there to buy drugs?

8       A    Well, because I -- yes.

9       Q    And on what basis did you draw that

10 conclusion; only from what he said?

11      A    Only from what you said, and only from what

12 you and I discussed earlier.  You live here?

13      Q    I do.

14      A    I live in New London.

15      Q    Right.

16      A    And when I drive past that parking lot, don't

17 you think I see things that don't look like right?

18      Q    That was my question early.  So you have seen

19 activity there that --

20      A    No.  No.

21      Q    Hang on.  -- appears illegal?

22      A    Uh-huh.

23      Q    You have seen that?

24      A    Uh-huh.

25      Q    On numerous occasions?

```
 1       A     Uh-huh.

 2       Q     Prior to this incident?

 3       A     Yeah.

 4       Q     And after this incident?

 5       A     Yes.

 6       Q     All right.  And you live nearby?

 7       A     Uh-huh.  But I also want to be on record that
 8  I'm not involved.

 9       Q     I understand.

10       A     I'm not involved.  You have no reason to put
11  me in that manner.  I'm not involved.  I don't give a
12  damn about the rest of the people out there.  I care
13  about me and what I do.

14       Q     Did you know the officer who stopped you?

15       A     I've seen him on numerous occasions in my
16  community.  I don't know him personally, but I've seen
17  him in the community.  I've seen his behavior in the
18  community.  I've seen his bullying in the community.

19             That's my wife.

20             MR. DAY:  Do you need to take that?

21             THE WITNESS:  Let me see.

22             MR. DAY:  Off the record.

23                (Recess taken)

24             MR. DAY:  Let's go back on the
25  record.
```